ORDER
 

 ANDERSON, United States Magistrate Judge.
 

 This matter arises on the motion of Plaintiff BHP Copper, Inc. (“BHP”) to Disqualify James Norris and the Firm Hydro Geo Chem as Litigation Consultants for Phelps Dodge Miami, Inc., (“PDMI”) and Inspiration Consolidated Copper Company (“Inspiration”), (document # 1348) The Court conducted an evidentiary hearing on this motion on February 4 and 5, 2004 during which Evelyn Bingham, BHP’s chief environmental engineer, Wayne Fuller, a senior environmental engineer at BHP, and James Norris testified. The Court will consider the merits of the motion below.
 

 FACTUAL BACKGROUND
 

 I. Hydro Geo Chem and the Pinal Creek Group
 

 Hydro Geo Chem, Inc. (“HGC”) is a “consulting firm that provides the mining industry with support in dewatering and environmental projects.” (document # 1348, Exh. A) Since 1986, HGC has served as an environmental consultant to
 
 *MCCLVI
 
 PDMI and its predecessors Cyprus Miami Mining and Inspiration, (document # 1348, Exh. B at 22, 25
 
 [1]
 
 ; document # 1380, Exb. I
 
 [2]
 
 )
 

 In May of 1990, PDMI (then known as Cyprus), Inspiration, and BHP (then known as Magma Copper Company) formed the three member Pinal Creek Group (“PCG”) to investigate and conduct remediation of a common waterway and to conduct source control work individually, (document # 1348, Exh. C
 
 [3]
 
 ; Tr. 29:6-29:18
 
 [4]
 
 ) At its formation, the PCG retained HGC as an environmental consultant to “develop common remediation goals and to figure out what kind of facilities needed to be built to do the remediation” at the Pinal Creek site, (document # 1348, Exh. B at 22-23, Exh. C; Tr. 33:17-33:25, 103:25-104:4, 241:2-241:7) James Norris, an HGC hydrologist, has been HGC’s primary client contact for the PCG members since its formation, (document # 1348, Exh. B at 22; Tr. 103:5-103:8) In that capacity, Norris has served as a litigation consultant for the PCG in the pending litigation, (document # 1348, Exh. B at 42-43, 195) HGC has remained under contract with the PCG on a continuous basis from 1990 to the present, (document # 1348, Exh. B at 16, 22-26, Tr. 102:7-102:19) From 1990 to the present, the PCG members have paid HGC approximately $10,000,000. in consulting fees, (document # 1348, Exh. C at ¶ 6, Exh. B at 24, Tr. 44:12) As a member of the PCG, BHP has paid one third of HGC’s invoiced services, (document #1348, Exh. C at ¶ 6; Tr. 43:19-44:19, 118:17-119:6) The remaining portion has been paid by Inspiration, Cyprus Miami or PDMI. (Tr. 44:14-44:19)
 

 The PCG members’ 2000 Consulting Agreement with HGC is the most recent agreement in the series and is the only relevant contract between HCG and the PCG for purposes of the pending motion. The 2000 Consulting Agreement defines confidential information and includes a non-disclosure provision which prohibits HGC from using such information for its own purposes or for third parties:
 

 Specifically, section 5.1, entitled “Nondisclosure,” provides that:
 

 Consultant acknowledges that Company
 
 [5]
 
 is the owner of valuable trade secrets and other confidential information and such similar information which is licensed from third parties. Consultant will treat as strictly confidential and will not use for its own purpose or for third parties or divulge or permit to be divulged to or examined or copied by others, all information and data obtained by Consultant in connection with this Agreement or otherwise which: (i) are confidential or proprietary to Company including without limitation, the Work Product
 
 [6]
 
 , (ii) related to the operations,
 
 *MCCLVII
 
 policies, procedures, techniques, accounts, and personnel of Company; or (iii) are confidential or proprietary to a third party and are in the possession, custody, or control of Company ....
 

 (document # 1348, Exh. D at § 5.1, hearing exhibit 5)
 

 Norris testified that he was aware of the confidentiality provisions and had reviewed them. (Tr. 110:17-111:2, 111:20-112:4, 114:15-114:17) Before releasing confidential PCG information to a third party, Norris usually sought authorization from the PCG Steering Committee. (Tr. 106:20-107:6) Norris also testified that he understood that Norris’/HGC’s consulting contract with the PCG prohibited the release of PCG confidential information against the interests of any one PCG member. (Tr. 211:21-212:25) Contrary to PDMI’s/Inspiration’s assertion, release of confidential PCG information to a third party — such as Dr. Fetter would violate the 2000 Consulting Agreement.
 

 II. HGC’s Separate Relationship with PDMI and Inspiration
 

 Since 1986, HGC has served as an environmental consultant for PDMI and Inspiration. (document # 1348, Exh. B at 27) Norris has been the principal contact for this work. (Norris’s May 22, 2003 Declaration) Norris performed remedial investigative
 
 [7]
 
 work (“an analysis of groundwater flow and potential sources to the Pinal Creek contamination”), including the Phase I Remedial Action Plan originally submitted to government agencies by PDMI (then Cyprus). (Tr. 183:7-183:20, 184:3-184:9,186:24-187:4) After PCG’s formation, members determined that the remedial investigation work served a common PCG purpose. Therefore, BHP paid a 1/3 share of the cost and HGC’s prior remedial investigation and the Phase I remedial action plan for PDMI became PCG work. (Tr. 221:3-221:14)
 

 At the February 4, 2004 hearing, Evelyn Bingham testified that BHP, as a member of PCG, did not object to HGC’s/Norris’s independent work for PDMI because Norris advised BHP that HGC’s services for PDMI concerned only PDMI’s independent source control work
 
 [8]
 
 , including investigating Webster Gulch which was part of PDMI’s property, (document # 1348, Exh. C ¶ 9; Tr. 47:25-48:17, 50:15-51:18) Bing-ham testified that she had concerns that Norris could separate his work for PDMI and act as a common consultant for the PCG and asked Norris several times whether he could separate his work for the PCG from his work for PDMI. (document # 1348, Exh. C ¶ 10, Exh. B at 232, Tr. 51:21-53:4, 99:7-100:3) Specifically, Bing-ham remembers a conversation with Norris in the parking lot after a PCG Technical Committee meeting in the early 1990’s. (Tr. 52:13-53:7) Norris advised Bingham that he could “divorce” the work he was doing for PDMI at Webster Gulch from his PCG work.
 
 (Id.)
 
 Bingham recalls several other conversations with Norris dur
 
 *MCCLVIII
 
 ing the late 1990’s regarding his ability to separate his source control work for PDMI from his work for PCG. Bingham stated that she informed Norris in a telephone conversation that “things were heating up” between PDMI and BHP on allocation issues. Norris reassured Bingham that he could keep his PDMI and PCG work separate. (Tr. 53:18-54:13)
 

 Similarly, Wayne Fuller testified that after a PCG Technical Committee Meeting in the late 1990s, he spoke to Norris regarding the potential for a conflict of interest. (Tr. 230:1-230:20) He urged Norris not to place himself in a conflict situation. (Tr. 230:2-230:20) Norris advised Fuller that he was aware of the potential conflict on allocation issues and assured Fuller that he would avoid a conflict situation. (Tr. 230:21-231:1)
 

 During the hearing, Norris testified that he does not recall such conversations with Bingham or Fuller. (Tr. 208-2:208:21) The Court, however, finds Norris less than credible. Norris was very direct and forthright when questioned by counsel for PDMI/Inspiration. However, when questioned by BHP’s counsel, Norris often had a cloudy memory or required counsel to repeat a question multiple times before he would provide a responsive answer. (Tr. 211:21-212:25, 208:22-211:20)
 

 During Norris’ March 27, 2003 deposition in this case, Norris disclosed to BHP for the first time that he had been retained by PDMI/Inspiration within the last two years as a litigation consultant for PDMI/Inspiration on cost/recovery issues, (document # 1348, Exh. C ¶ 10, Exh. B at 43-44, 174, Tr. 61:15-63:6) Norris was evasive in answering questions which BHP’s counsel posed regarding whether Norris had any separate contracts to serve as a litigation consultant for PDMI/Inspiration. Norris responded that he was hired by the law firm Beshears, Wallwork, and Bellamy (“BWB”) but was reluctant to admit that he knew his services were ultimately for the benefit of PDMI/Inspiration. (Tr. 149:5-150:4)
 

 During the February 2004 evidentiary hearing, Norris stated that he had discussed with BWB the possibility of becoming a litigation consultant for BWB before April 1, 2002. (Tr. 155:10 -155:14) On April 2, 2002, Norris signed a contract as a litigation consultant with BWB. (Tr. 149:2-149:9, 151:2-151:8) BWB paid HGC approximately $48,000 under this contract. (Tr. 148:16-148:23) It is undisputed that BWB forwarded HGC invoices to PDMI/Inspiration and received payment in these amounts from Phelps Dodge Corporation (“PD”) the parent company of PDMI. (hearing exhibit 138
 
 [9]
 
 , Tr. 148:16-148:23,149:22-150:4)
 

 Norris/HGC worked as a litigation consultant under contract with BWB from approximately April 1, 2002 through April of 2003. (hearing exhibit 138) During this period, Norris participated in several meetings with PDMI/Inspiration and its expert and engaged in activities contrary to the interests of BHP as discussed below.
 

 1. April 1 and 2, 2002 Meeting at BWB
 

 On April 1 and 2, 2002, Norris attended parts of a meeting at BWB offices during which Matt Wickham and Mark Logsdon
 
 [10]
 
 
 *MCCLIX
 
 showed a Power Point presentation to Dr. Fetter, representatives of PDMI and Inspiration, and BWB lawyers, (hearing exhibit 139, Tr. 115:2-115:16, 117:16-117:25, 155:15-156:25)
 

 As set forth below, the Court finds that during the April 1 and 2, 2002 meeting, Norris received information regarding PDMI’s technical and legal strategy regarding the allocation of contaminants among sources of BHP’s properties (Property B) and sources on PDMI’s properties (Property A). Specifically, On April 3, 2002 Wickham sent Norris an e-mail attaching Power Point file entitled “March 1, 2002 PD SAS APPORTIONMENT,” and stating that the information requested from “yesterday’s presentation” is attached. (hearing exhibit 80) This file included the Power Point slides that Wick-ham had presented during the previous day’s meeting which Norris and Dr. Fetter had attended. (Tr. 155:15-156:5, 156:18-156:25,157:18-157:25)
 

 During the evidentiary hearing, BHP presented a printout of the Power Point slides contained within the electronic file “March 1 2002 SAS Apportionment” as disclosed to BHP. (hearing exhibit 82, Tr. 161:12-162:21) Norris’s file, as disclosed to BHP, contained printed copies of certain slides from the aforementioned file, (hearing exhibit 80, Tr. 158:5-158:9, 159:2-159:5) The slides include graphs allocating contaminant (mass metals) loading among various sources at the Pinal Creek Site. A graph compares loading from BHP’s Number 2 Tailings to loading from sources on PDMI property, including Webster Gulch, (hearing exhibit 80, Tr. 160:20-161:11) The slides do not refer to any of the Defendants in this action, (hearing exhibit 80, 82, Tr. 161:12-161:16)
 

 Norris’ handwritten notes from the April 1 and 2, 2002 meeting refer to BHP’s allocation position, (hearing exhibit 100, Tr. 163:1-165:17) Specifically, Norris’s notes state: “Prop. A 96 % Prop. B 4%”— “Allocation formulas”
 

 “BHP — left common counsel. Rejected [copper] production — mass loading approach from start of mining until present.”
 

 (hearing exhibit 100 at HGC NP2 001703, Tr. 165:3-165:16) Although Norris again claimed that he could not recall specific discussions regarding BHP’s allocation position, the notes indicate that during the April 1 and 2 meeting, BHP’s position on allocation was discussed. (Tr. 163:22-165:17) The discussion of BHP’s allocation position in contrast to that of PDMI/Tnspi-ration indicates that Norris was working against the interests of BHP.
 

 2. April 23, 2002 Meeting at BWB
 

 On April 23, 2002, in his capacity as a litigation consultant for BWB, Norris attended a meeting at BWB offices with Fred Bellamy and other BWB lawyers, (hearing exhibit 139) Norris’s file contains a document drafted by Bellamy entitled “Agenda” which is dated April 23, 2002, the same day as Norris’s meeting at BWB. (hearing exhibit 87, Tr. 165:24-167:5) The agenda includes the following topics:
 

 I. Role we are expecting Jim [Norris] to play
 

 II. Jim’s reaction to Golder/Geochemi-ca work
 

 III. Jim’s reaction to BHP’s analysis (to the extent he knows it)
 

 IV. Jim’s reaction to and impression of stand-alone cost method, as applied to Pinal Creek
 

 V. Brainstorming regarding allocation strategy
 

 VI. Experts needed to support allocation positions
 

 VII. Data to provide Dr. Fetter
 

 (hearing exhibit 87) As is his pattern when questioned by BHP counsel, Norris again
 
 *MCCLX
 
 claims that he does not recall any discussions at the April 23, 2002 meeting. (Tr. 165:21-168:4) The Agenda demonstrates, however, that the meeting pertained to positions adverse to BHP on the cost allocation at the Pinal Creek Site and to PDMI’s plan that Norris would assist PDMI’s expert Dr. Fetter. Norris did testify that the purpose of the April 23, 2002 meeting was to further his role as litigation consultant for BWB which included analyzing a stand-alone cost methodology and related matters on allocation. (Tr. 167:18-168:15)
 

 3. Documents, Meetings, and Conference Calls in which Norris Participated
 

 Norris also attended other meetings regarding cost allocation issues that concerned BHP. (Tr. 170:23-173:15) Norris engaged in discussions with PCG members regarding a Feasibility Study that included several alternatives to remediate the Pinal Creek Site. (Tr. 120:22-120:24, 121:1-121:3) These seven options and their related costs were discussed in PCG Technical Committee Meetings. (Tr. 121:1-122:24)
 

 On April 1, 2002, Norris participated in a conference call with Stan Curry (counsel for PDMI) and Stephen Johnson, one of PDMI’s consultants, regarding the allocation of costs, (hearing Exh. 97, Tr. 153:15-153:25) On May 8, 2002, Norris participated in another telephone conference with Curry, one or more BWB lawyers, and others regarding allocation issues, (hearing exhibit 139, Tr. 173:21-174:2)
 

 During the February 2004 hearing, the Court received in evidence documents related to cost allocation (hearing exhibits 91, 92, 98, 99, 100, and 102) which Norris possessed in connection with his role as litigation consultant for BWB. The Court agrees with BHP that these documents show that Norris participated in the development of PDMI’s and Inspiration’s strategy regarding the allocation of costs and contaminants between PDMI properties (Property A) and BHP properties (Property B), in a manner adverse to BHP’s interests. (Tr. 163:8-163:12,168:16-168:24)
 

 These materials include documents that Norris received from Stephen Johnson (hearing exhibits 98, 99, 102) which refer to cost allocation between PDMI properties (Property A) and BHP properties (Property B) and to the stand-alone cost allocation, (hearing exhibit 99 at HGC NP2 001452, 54, 67; hearing exhibit 102 at HGC NP2 001677, 79-92) Additionally, the Court received in evidence two exhibits which include Norris’s handwritten notes regarding allocation. For example, Norris wrote the following notes:
 

 Should there be a burden on BHP, pursuant to equitable factors consideration, for (a) initiating new releases despite WQARF status; (b) but not using appropriate care while producing a benefit. Why should PD pay a disproportionately larger % of response costs to remove metals released by BHP.
 

 (hearing exhibit 91 at HGC NP2 008171; hearing exhibit 92 at HGC NP2 001880, Tr. 168:16-168:24, 170:23-172:15) Norris’ other notes set forth the allocation percentages between PDMI properties (Property A) and BHP properties (Property B) and indicate that PDMI’s allocation position is vastly different from that of BHP. (hearing exhibit 91 at HGC NP2 001870, 71-72)
 

 4. May 16 — 17, 2002 Tour of Pinal Creek Site
 

 The parties agree that Norris participated in a two-day tour of the Pinal Creek Site with Dr. Fetter and other PDMI/In-spiration agents, (hearing exhibit 139) On May 16 and 17, 2002, Norris met Dr. Fetter, Daniel Johnson (“Johnson”) a PDMI employee, and Wickham at the Pinal Creek site for a tour. The tour traveled
 
 *MCCLXI
 
 down Upper Pinal Creek which runs past BHP’s Old Dominion property. (Tr. 175:8-175:12) They also stopped on a hillside across from BHP’s Miami Unit and discussed the Miami Unit, (hearing exhibit 139, Tr. 174:3-175:22) In relation to the site tour, Norris presented PowerPoint slides regarding the Pinal Creek site to Dr. Fetter, Wickham, Johnson, and others, (hearing exhibit 139, Tr. 115:17-115:20, 174:3-174:25) Norris’ Power Point presentation contains information which Norris gathered as a consultant for the PCG. (hearing exhibit 105, Tr. 175:23-176:12) BHP was not informed that the parties had entered BHP’s property at that time. The secretive nature of PDMI’s/Inspiration’s relationship with Norris suggests that those parties were aware that they were engaging in an improper conflict of interest to the detriment of BHP. See,
 
 Koch,
 
 85 F.3d at 1183 (finding it troubling that counsel did not directly notify opposing counsel of the intent to use the opponent’s former expert at trial.)
 

 5. Review of Expert Reports
 

 Significantly, the Court also finds that, as a litigation consultant for PDMUInspi-ration, Norris met with PDMI/Inspiration expert Dr. Fetter and reviewed PDMI’s/Inspiration’s expert reports and commented on those reports, (document # 1348, Exh. B) Specifically, during the spring of 2002, Norris consulted with Dr. Fetter, who disagrees with BHP’s expert, Dr. Davis, on several key issues, (document # 1348, Exh. B at 231, 233, Exh. E at 374-377
 
 [11]
 
 )
 

 On July 30, 2002, Dr. Fetter and Dr. Davis disclosed their original expert reports. (hearing exhibit 139) On November 26, 2002, BWB attorney Leslie Cooper mailed Norris copies of Dr. Fetter’s and Dr. Davis’s expert reports, (hearing exhibit 106)
 

 Shortly before Dr. Fetter disclosed his expert rebuttal report, on January 10, 2003, Norris sent Cooper an e-mail with a two-page attachment. The e-mail states that “[t]his discussion shows uses disparity of estimates of flow and metals to illustrate the inadequacy of pre-1980 data for mass load estimation.” (hearing exhibit 109 at 1, 139) In the attachment Norris wrote:
 

 Mass loading estimates are unreliable prior to the 1980s when systematic environmental monitoring began because of extreme uncertainty in the flow and concentration of ground water.
 

 (hearing exhibit 109 at 2) Norris supported his conclusion with several charts comparing data from the reports of Dr. Davis, BHP’s expert, and the reports of defendant Newmont’s experts, (hearing exhibit 109 at 2-3)
 

 Also, on January 10, 2003, Norris emailed Cooper a memorandum discussing a “couple of issues related to Miami No. 2 tailings.” (hearing exhibit 110 at 1) The memorandum discusses the possibility that BHP’s Miami No. 2 Tailings was a source of contamination to the Pinal Creek site, a position which is adverse to BHP. (Tr. 235:2-235:6) In his work for PCG, Norris has participated in confidential discussions regarding BHP’s Miami Unit No. 2 Tail-ings as a potential source of contamination to the aquifer. (Tr. 235:2-235:8)
 

 On January 23, 2003, Norris sent Cooper an e-mail with a one-page memorandum attached which provided a “few thoughts on Bethke’s rebuttal.” Dr. Beth-ke is a testifying expert for PDMI and Inspiration on the allocation issues. (Tr. 235:13-235:20, hearing exhibit 126) The
 
 *MCCLXII
 
 January 23, 2003 memorandum notes that Dr. Bethke’s report contrasts the opinion of Dr. Davis (BHP’s testifying expert) on the time frame for the Pinal Creek remediation, as measured by the number of pore volumes required to flush the aquifer, with Norris’ opinion on that issue. (Tr. 235:12-235:25) The issue of the estimated pore volumes required for flushing the Pinal Creek aquifer had been a topic of PCG meetings. (Tr. 235:22-236:3)
 

 Also on January 23, 2003, Norris emailed Cooper three pages of comments on Dr. Fetter’s draft rebuttal report. (Tr. 236:7-236:11; hearing exhibit 127) Norris states that: “I think the rebuttals have progressed our client’s objectives.” (hearing exhibit 127)(Emphasis added) At the February 2004 hearing, BHP employee Wayne Fuller testified that “PDMI objectives with regard to the expert reports are directly in contrast to BHP’s.” (Tr. 236:12-236:19)
 

 Norris’ following statements in the January 23, 2003 e-mail demonstrate Norris’ adversity to BHP:
 

 * Norris praises Dr. Fetter for “bringing home the concepts on allocation” that “[BHP’s] Miami No. 2 is a significant contributor to the need for response in lower Pinal Creek.” (hearing exhibit 127 at 2)
 

 * Norris “couldn’t agree ... more” with Dr. Fetter’s opinion 6. (hearing exhibit 127 at 4) Fetter’s opinion 6 discusses the impact of BHP’s Miami No. 2 Tailings on contamination in Pinal Creek, (hearing exhibit 125 at JN.02-HGC.00572) (Fetter’s draft rebuttal report as transmitted from BWB to Norris on January 21, 2003)
 

 * Norris agrees with Dr. Fetter’s opinions 7 and 8. (hearing exhibit 127 at 4) Fetter’s opinions 7 and 8 attack the opinions of Dr. Davis, BHP’s expert. Fetter’s opinion 7 states: “The Expert Report of Dr. Andy Davis contains several statements that are misleading.” (hearing exhibit 125 at JN.02-HGC. 00573) Fetter’s opinion 8 states: “I have significant disagreements with the following major opinions expressed in the Expert Report of Dr. Andy Davis.” (hearing exhibit 125 at JN.02-HGC. 00574).
 

 The foregoing illustrates that Norris, as a consultant for PDMI/Inspiration, used BHP/PCG confidential information to help advance PDMI’s position on allocation which is adverse to BHP.
 

 6. Assistance to Dr. Fetter
 

 As a litigation consultant for PDMI/In-spiration, Norris also directly assisted Dr. Fetter in preparing his rebuttal report. Norris reviewed and commented on Dr. Fetter’s reports, provided information and documents for Dr. Fetter’s rebuttal report, and toured the Pinal Creek Site with Dr. Fetter, (document # 1348, Exh. E at 306, 307, 312, 351, 352, 374, 377, 440, 441) Additionally, Norris provided comments on Dr. Fetter’s rebuttal report which are adverse to the report of BHP’s expert, Andy Davis, (document # 1348, Exh. B at 234) During his deposition, Norris testified that he has seen Dr. Davis’s report (document # 1348, Exh. B at 233) and that he is aware that Dr. Fetter and Dr. Davis disagree on several issues regarding the Pi-nal Creek site.
 
 (Id.)
 
 On January 10, 2003, Norris had a 26-minute telephone conference with Dr. Fetter, (hearing exhibit 117) Thereafter, Norris sent Dr. Fetter three separate e-mails, each with an Excel spreadsheet file attachment, (hearing exhibits 118-124) Norris admits that he provided Dr. Fetter with several pieces of information including two graphs depicting data from Defendant Newmont’s experts Horton and Gailey. (Tr. 197:25-198:12) Norris also provided Fetter with a water balance model from the early 1900s to the
 
 *MCCLXIII
 
 present. (199:17-201:11) Finally, Norris sent Dr. Fetter data from expert reports filed by Dr. Runnells and Dr. Davis depicting concentration and flow from Webster Lake. (Tr. 201:12-201:24) Dr. Run-nells is Newmont’s expert and Dr. Davis is BHP’s expert. The parties stipulate that sometime between January 10 and 31, 2003, Dr. Fetter inserted one of the graphs which Norris had sent him into his rebuttal report, (hearing exhibit 139) The graph that Dr. Fetter inserted into his rebuttal report is contained in the spreadsheet “Davis_Flux.xls.” (hearing exhibit 119; exhibit 124; Tr. 236:25-237:4) The graph is adverse to BHP because it contrasts Davis’s mass loading approach to the conclusions of defendants’ experts. (Tr. 237:5-237:9) Dr. Fetter inserted the graph labeled “Figure 1” into his rebuttal report. (Tr. 237:5-237:17, hearing exhibit 119 (figure 1); exhibit 43 at 21) On January 31, 2003, Dr. Fetter’s and Dr. Davis’s rebuttal reports were disclosed, (hearing exhibit 139)
 

 Before PDMI and Inspiration terminated their independent relationship with Norris and HGC, BHP filed the pending motion. The party seeking disqualification bears the burden of proof.
 
 Stencel v. Fairchild Corp.,
 
 174 F.Supp.2d 1080, 1083 (C.D.Cal.2001)(citing
 
 English Feedlot, Inc. v. Norden Laboratories, Inc.,
 
 833 F.Supp. 1498, 1501-02 (D.Colo.1993)).
 

 ANALYSIS
 

 I. Standard
 
 [12]
 

 Federal courts have inherent authority to disqualify experts “if necessary to preserve public confidence in the fairness and integrity of the judicial system.”
 
 Koch Refining Co. v. Jennifer L. Boudreaux, M/V, 85
 
 F.3d 1178, 1181 (5th Cir.1996);
 
 Wang Laboratories, Inc. v. Toshiba Corp.,
 
 762 F.Supp. 1246, 1248 (E.D.Va.1991);
 
 Campbell Industries v. M/V Gemini,
 
 619 F.2d 24, 27 (9th Cir.1980)(“A district court is vested with broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial... including disqualifying expert testimony.”);
 
 Paul v. Rawlings Sporting Goods,
 
 123 F.R.D. 271, 278 (S.D.Ohio 1988). Disqualification of an expert is appropriate when a party retains an expert who previously worked for an adversary and received confidential information from the first client. See,
 
 Erickson v. Newmar Corp.,
 
 87 F.3d 298, 300 (9th Cir.1996)(ac-knowledging that in a “switching sides” case, the “court may grant the original hiring party’s motion to disqualify the expert when it is determined that the expert is in possession of confidential information received from the first client.”);
 
 Koch,
 
 85 F.3d at 1180 (stating that there is a “clear case for disqualification” when an expert switches sides in the same litigation after receiving confidential information from the adverse party pursuant to its earlier retention.) Although most expert disqualification cases involve a testifying expert, courts employ the same test in determining whether to disqualify a consulting expert. See,
 
 Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,
 
 734 F.Supp. 334 (N.D.Ill.1990)(denying motion to disqualify expert consultant under the same test used when considering disqualifying a testifying expert finding that there was no “leakage” of information between defendants’ experts and plaintiffs expert both of whom worked for the same company.);
 
 Conforti & Eisele, Inc. v. New Jersey,
 
 170 N.J.Super. 64, 405 A.2d 487 (1979).
 

 To resolve a motion to disqualify an expert in cases other than where an expert has clearly switched sides, the court un
 
 *MCCLXIV
 
 dertakes a two-step inquiry.
 
 Stencel v. Fairchild Corp.,
 
 174 F.Supp.2d 1080, 1083 (D.Ca.2001);
 
 Koch,
 
 85 F.3d at 1181. The court must determine whether (1) it was objectively reasonable for the moving party to believe that it had a confidential relationship with the expert; and (2) whether the moving party disclosed confidential information to the expert that is relevant to the current litigation.
 
 Stencel,
 
 174 F.Supp.2d at 1083(citing
 
 Paul,
 
 123 F.R.D. at 278);
 
 Wang,
 
 762 F.Supp. 1246, 1248. “Affirmative answers to both inquiries compel disqualification.”
 
 Id.
 

 In analyzing the disqualification issue, the court also balances competing policy objectives and considers concerns of fundamental fairness.
 
 Koch,
 
 85 F.3d at 1182. “ ‘The policy objectives favoring disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process.’ ”
 
 Id.
 
 (quoting
 
 English Feedlot,
 
 833 F.Supp. at 1504). Policies disfavoring disqualification include “ensuring that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling.”
 
 Id.
 
 (citing
 
 English Feedlot,
 
 833 F.Supp. at 1504-05).
 

 II. The Adversarial Relationship between BHP and PDMI/Inspiration
 

 As a preliminary matter, BHP argues that the Court should disqualify Norris because BHP and PDMI/Inspiration, although co-plaintiffs, are adversaries on certain issues in this litigation. See,
 
 Fidelity & Casualty Co. of New York v. Federal Express,
 
 136 F.2d 35, 38 (6th Cir.1943)(reeognizing that co-parties may, in fact, be adversaries on an issue). BHP argues that because Norris worked as a litigation consultant for BHP as a member of the PCG and subsequently worked as a litigation consultant for PDMI/Inspiration on the cost-recovery issue on which BHP and PDMI/Inspiration hold adversarial positions, Norris has essentially “switched sides.” BHP argues that because of the pending judicial allocation of liability for environmental costs at the Pinal Creek Site, the PCG members have advanced adversarial positions regarding allocation based on their Property A/Property B affiliation. PDMI/Inspiration contend that BHP, not HGC, chose to diverge from the PCG to pursue its own theory of allocation and, therefore, it should suffer the consequences of its choice — including PDMI’s/Inspiration’s retention of Norris as a consulting expert on the allocation issues. However, the manner in which co-plaintiffs became adversaries does not change the disqualification analysis. See,
 
 Koch,
 
 85 F.3d at 1181(applying the two-part test for disqualification despite the fact that the retaining party, rather than its expert, “switched sides” in the litigation.) The Court again notes that Norris’ failure to inform BHP of his consulting contract with PDMI/Inspiration suggests that Norris knew that he was engaging in a potential conflict of interest and, most certainly, PDMI’s/Inspiration’s lawyers knew or should have known of the conflict of interest. See,
 
 Koch,
 
 85 F.3d at 1181 (finding it troubling that a party who had retained its adversary’s expert did not directly notify its adversary of the retention until it listed the witness as a testifying expert.) In view of the adverse positions that BHP and PDMI/Inspiration have taken on the allocation issue, the Court finds that Norris switched sides when he accepted employment as a litigation consultant for PDMI/Inspiration on the allocation issue. This finding, however, does not impact the Court’s disqualification analysis because, in an abundance of caution, the Court will apply the test for disqualifying an expert which applies in cases other than those in which an expert has clearly switched sides. See,
 
 Koch,
 
 85 F.3d at 1181(stating that where an expert clearly switched sides in the same litiga
 
 *MCCLXV
 
 tion, there is a clear case for disqualification but noting that in other situations, courts have rejected a “bright line” rule.)
 

 III. Whether it was objectively reasonable for BHP, as a PCG member, to believe it had a confidential relationship with Norris and HGC
 

 The first step of the two-part disqualification analysis requires the court to determine whether it was objectively reasonable for BHP, as a PCG member, to believe that it had a confidential relationship with Norris and HGC. See,
 
 Stencel,
 
 174 F.Supp.2d at 1082. Contrary to PDMI’s/Inspiration’s assertion, BHP need not establish that its relationship with HGC was confidential as to PDMI/Inspiration who were also PCG members. After review of the pleadings in this matter, the testimony, and the exhibits admitted at the February 4 and 5, 2004 hearing, the Court concludes that it was objectively reasonable for BHP, as a member of the PCG, to conclude that it had a confidential relationship with HGC and Norris. Indeed, the Court finds that such a confidential relationship existed.
 

 Federal courts have found that a confidential relationship exists when “ ‘the record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party’s] modus oper-andi, patterns of operations, decision making process, and the like.’ ”
 
 Koch,
 
 85 F.3d at 1182 (quoting
 
 Marvin Lumber Co. v. Norton Co.,
 
 113 F.R.D. 588, 591 (F.R.D.1986))(disqualifying expert who had long-term access to adverse party’s manufacturing and research facilities and performed in-house tests.) As such, a confidential relationship can exist absent a confidentiality agreement between the retaining party and the expert.
 
 Wang,
 
 762 F.Supp. at 1247-1249 (confidential relationship found to exist despite lack of confidentiality agreement where party’s counsel retained expert for only one month and paid $1,540 for services rendered.)
 

 The existence of a confidential agreement may also establish the existence of a confidential relationship. See,
 
 Paul v. Rawlings Sporting Goods Co.,
 
 123 F.R.D. 271, 279 (S.D.Ohio 1988)(“[A] formal written contract establishing both the existence of the relationship and prohibiting the disclosure of any information gained by the expert during the course of the relationship ... [is] an ideal way to eliminate questions” regarding the existence of a confidential relationship.);
 
 Space Systems Loral v. Martin Marietta Corp.,
 
 1995 WL 686369 (N.D.Cal.1995)(finding that there was no doubt that expert who signed numerous confidentiality agreements with party was disqualified from serving as expert for adverse party.)
 

 As set forth in Section I,
 
 supra,
 
 BHP, as a member of the PCG, has retained HGC and Norris as expert consultants for over 12 years and has paid over $3.17 million for their services. See,
 
 Wang,
 
 762 F.Supp. at 1247 (noting that payment of $1,540 for expert services was evidence that confidential relationship existed);
 
 Koch,
 
 85 F.3d at 1180 (finding confidential relationship noting that retaining party paid expert approximately $8,000 and obtained two detailed written reports of his opinions.). But see,
 
 Paul,
 
 123 F.R.D. at 280 (finding no basis to disqualify an expert noting that expert did not derive any of his specific ideas from work done under party’s direction or using its funds.) The longstanding relationship between HGC and the PCG and BHP’s payment of over $3 million to HGC, establishes the existence of a confidential relationship. Additionally, as discussed in Section I,
 
 supra,
 
 the PCG members retained HGC through a series of confidentiality agreements that establish
 
 *MCCLXVI
 
 the existence of confidential relationship. See,
 
 Stencel,
 
 174 F.Supp.2d at 1084. The Court finds that BHP, as a member of the PCG, has established a confidential relationship with Norris/HGC and has satisfied the first step of the disqualification test.
 

 IV. Whether BHP, as a PCG member, disclosed confidential information to HGC and Norris
 

 The second step of the disqualification analysis requires BHP to establish that it in fact disclosed confidential information to Norris. See,
 
 Paul,
 
 123 F.R.D. at 278. PDMI/Inspiration contend that BHP cannot satisfy this test because it waived any confidentiality as to information disclosed to Norris. The Court disagrees. The Court finds that BHP, as a PCG member, has established that it had a lengthy and involved relationship with HGC and Norris. Courts have recognized that in such cases, once a confidential relationship is established, a presumption that confidential communications were made is appropriate:
 

 There may well be cases in which the attorney-expert relationship with respect to a particular litigated matter is so strongly established through proof of substantial work performed by the expert relating to the case, that no testimony as to the nature of the communications between the two is necessary in order for the court to conclude that, in all fairness, the expert should not serve in any capacity for the opposing side.
 

 Paul,
 
 123 F.R.D. at 281. In addition to noting that the foregoing presumption could apply in this case, the Court finds that the BHP, as a member of PCG, disclosed confidential information to Norris. The Court will address PDMI’s waiver argument in Section V,
 
 infra.
 

 Confidential information includes disclosures containing information in the nature of attorney work-product or privileged attorney-client communications.
 
 Mitchell v. Wilmore,
 
 981 P.2d 172, 176 (Colo.1999). Such information [includes] discussion of the retaining party’s strategies in the litigation, the kinds of experts [the party] expected to retain, [the party’s] views of the strengths and weaknesses of each side, the role of each of the [party’s] witnesses to be hired, and anticipated defenses.’ ”
 
 Koch,
 
 85 F.3d 1178, 1182 (quoting
 
 Mayer v. Dell,
 
 139 F.R.D. 1, 4 (D.D.C.1991)). Courts are more likely to disqualify an expert when the expert has been exposed to legal strategies.
 
 Stencel,
 
 174 F.Supp.2d at 1083 (citing
 
 Koch,
 
 85 F.3d at 1181).
 

 Norris admits that he was retained as a consulting expert for the PCG and assisted the PCG members, including BHP, as a litigation consultant in this matter. Evelyn Bingham testified that Norris has engaged in discussions with PCG’s former common counsel, each PCG member’s separate counsel, and corporate representatives of the PCG members regarding the PCG’s legal strategy, (document # 1348, Exh. C ¶ 8) BHP “provided Norris with free access to its corporate files, permitted Norris to collaborate with BHP’s various counsel to produce HGC work product, and allowed Norris to both inspect and conduct testing on BHP property for over a decade.”
 
 (Id.)
 
 Norris’ work for the PCG included designing monitor wells, collecting and analyzing water samples, running models, visiting the Pinal Creek site many times over a 14 year period, and determining how to stop the contamination in the common waterway. (Tr. 32:24-33:3, 104:15-104:22) Norris/HGC also prepared a Feasibility Study analyzing different cleanup options. (Tr. 120:15-124:19) The Study produced seven remediation alternatives for the remediation of the Pinal Creek site. As its lead technical consultant, Norris discussed the options and their potential costs with the PCG Technical Committee. Norris testified that he
 
 *MCCLXVII
 
 considered these conversations confidential.
 
 (Id.;
 
 188:13-188:22)
 

 Norris also discussed BHP’s Property B with BHP employees and participated in PCG legal strategy discussions regarding the Pinal Creek site with, among others, BHP attorneys. (Tr. 109:12-109:15, 121:7-124:19) See,
 
 Koch,
 
 85 F.3d at 1182. As the lead consultant for the PCG, Norris also assisted the PCG’s position in its arbitration with Phelps Dodge Corporation regarding BHP’s Old Dominion property in this litigation. (Tr. 132:10-133:25)
 
 Mitchell v. Wilmore,
 
 981 P.2d 172, 176 (Colo.1999)(finding a particularly clear case of disqualification when an expert is privy to explicit strategy discussions related to the pending litigation.) The Court also finds that Norris/HGC possess PCG confidential information that has not been disclosed to the public or to cost-recovery defendants. Specifically, the PCG former common counsel produced 25-page itemized HGC privilege log in the cost recovery action. The privilege log documents, HGC work product for the PCG, was not produced to the cost recovery defendants. (Tr. 221:19-224:19, hearing exhibit 72)
 

 V. Waiver of Confidentiality
 

 In opposition to the motion to disqualify, PDMI and Inspiration argue that BHP cannot satisfy the second step of the disqualification test because it waived confidentiality as to HGC/Norris by either (1) waiving its expectation of confidentiality as to PDMI and Inspiration as PCG members, or (2) disclosing some of Norris’s/HGC’s work product to the public or the Cost Recovery Defendants. PDMI’s and Inspiration’s argument is not fatal to BHP’s motion to disqualify Norris/HGC because BHP’s alleged waiver of its confidential information as to the PCG members does not diminish BHP’s objectively reasonable expectation that Norris/HGC would maintain confidentiality of the BHP and PCG information it received and created. See,
 
 English Feedlot,
 
 833 F.Supp. at 1502 (finding the waiver a party seeking disqualification must negate is whether “any confidential disclosures were undertaken without an objectively reasonable expectation that they would be so maintained [by the expert.]”)
 

 1. BHP’s Alleged Waiver of Confidentiality as to PCG Members
 

 PDMI and Inspiration argue that because BHP waived confidentiality as to members of the PCG, it also waived confidentiality as to its experts. Whether BHP waived its confidentiality as to PDMI and Inspiration as members of the PCG does not determine whether BHP waived confidentiality as to Norris/HGC. The test for disqualification of an expert does not require the movant to prove nonwaiver as to third parties. See,
 
 Stencel,
 
 174 F.Supp.2d at 1083.
 

 The Court finds that as a PCG member, BHP shared confidential information with Norris/HGC because BHP believed that the information would only be used by HGC/Norris for the PCG common purposes, (hearing exhibit 1 p. 24, § 11.3(a), p. 26, § 11.3(c), Tr. 112:3-112:12, 41:2-41:7, 232:3-232:10) The PCG Agreement itself provides that each PCG member’s confidential information could only be used by consultants for PCG common purposes:
 

 From time to time, the Members shall disclose or transmit to each other, directly or through counsel, such factual information as each Member or common counsel or technical consultant retained by the Steering Committee deems appropriate for the sole and limited purpose of (a) asserting any common claims or defenses related to the Pinal Creek Site; (b) developing and applying the Final Allocation Formula or Other Costs credit; and (c) coordinating such other
 
 *MCCLXVIII
 
 activities that are necessary and proper to carry out the purposes of this Agreement .... The Members intend that no claim of attorney/client or attorney work product or any other privilege be waived by reason of participating or cooperating in the common pursuit of, response to, or defense of, any claims arising out of the Pinal Creek Site.
 

 (hearing exhibit 1, p. 24 § 11.1) HGC’s most recent contract with the PCG, dated January 1, 2000, requires Norris/HGC to treat all confidential information and data obtained by the PCG as strictly confidential and prohibits Norris/HGC from using this information for its own purposes or for third parties, (hearing exhibit 5, pg. 8 § 5.1, Tr. 42:20-43:11, 114:2 -115:7) Norris testified that he understood that under section 5.1 of the agreement with the PCG, he was bound to maintain the confidentiality of PCG information. (Tr. 114:6-114:17)
 

 Pursuant to the PCG Agreement and HGC’s consulting agreements with the PCG, BHP disclosed confidential BHP information to Norris/HGC in his role as the PCG’s common consultant, (hearing exhibit 138, Tr. 43:22-44:19) Whether PDMI/In-spiration also had access to this information for PCG common purposes is irrelevant to Norris’ obligation to maintain the confidentiality of that information to parties outside of the PCG.
 

 PDMI/Inspiration argue that for purposes of the second step of the disqualification analysis, the relevant inquiry is whether BHP disclosed to Norris information that BHP maintained as confidential as to other PCG members. This argument simply does not make sense in a joint plaintiff situation such as the one in this case. Contrary to PDMI’s/Inspiration’s assertion, the expert disqualification test focuses on whether the retaining party disclosed confidential information to the expert and the expert’s use of confidential information against the client. See,
 
 Koch Refining,
 
 85 F.3d at 1181(noting that district court disqualified expert because moving party had not released expert to use its confidential information against it.)
 

 The expert disqualification test, however, does not require the moving party to establish that the expert disclosed confidential information to an adverse party.
 
 Stencel,
 
 174 F.Supp.2d at 1080, 1083. Rather, the moving party need only establish that it disclosed confidential information to the expert.
 
 Id.
 
 As previously stated, the Court finds that BHP, as a PCG member, disclosed confidential information to Norris. It is not necessary that all of the information that was disclosed to Norris was confidential. Rather, BHP need only show that “some confidential information” was given to Norris.
 
 Stencel,
 
 174 F.Supp.2d at 1085. Norris’/HGC’s use of BHP’s confidential information against BHP and its disclosure of BHP’s confidential information to third party testifying experts in the very same litigation in which Norris/HGC still works for the PCG establishes the existence of a conflict of interest which undermines the adversary process. The court’s power to disqualify experts is based, in part, on “the court’s inherent power to preserve the public confidence in the fairness and integrity of the judicial proceedings.”
 
 Paul,
 
 123 F.R.D. at 277-78 (citing
 
 Williams v. TWA, Inc.,
 
 588 F.Supp. 1037 (W.D.Mo.1984)). Thus, the court can disqualify an expert based on the fundamental unfairness such expert’s conflict of interest creates. See,
 
 Sells v. Wamser,
 
 158 F.R.D. 390 (S.D.Ohio 1994)(applying
 
 Paul
 
 to disqualify expert based on court’s inherent power to disqualify when a conflict of interest existed, despite the fact that the expert did not have the ability to disclose confidential information to adverse party.). The Court finds that BHP, as a PCG member, disclosed confidential information to Norris/HGC and that the confi
 
 *MCCLXIX
 
 dentiality of such information as to third parties was not waived by sharing such information with other members of the PCG for PCG purposes.
 

 2. Alleged Partial Waiver of Confidential Information
 

 PDMI/Inspiration further argue that BHP cannot satisfy the disqualification test because BHP partially waived confidentiality by disclosing information to the public and cost recovery defendants. BHP concedes that some PCG confidential information has been disclosed to the public, the Cost Recovery Defendants, and the PCG members separate consultants. (Tr. 67:16-67:18; 78:5-78:16, 244:10-247:24) However, the Court finds that Norris/HGC possess PCG confidential information that has not been disclosed to any of the foregoing parties. Specifically, the PCG former common counsel produced 25-page itemized HGC privilege log in the cost recovery action. The privilege log documents HGC work product for the PCG which was not produced to the cost recovery defendants. (Tr. 221:18-224:19, hearing exhibit 72) The Court finds that the fact that some PCG/BHP work product has been disclosed to the public or to cost-recovery defendants does not defeat BHP’s motion to disqualify Norris/HGC. The evidence reveals that not all PCG/ BHP confidential information has been disclosed. Thus, the Court still finds that BHP, as a member of the PCG, disclosed confidential information to Norris/HGC. Accordingly, BHP satisfies the second part of the test to disqualify Norris/HGC.
 

 VI. Weighing Policy Objectives
 

 Finally, in determining whether to disqualify an expert, the Court must weigh the policy interests implicated by disqualifying Norris and HGC as consulting experts to PDMI/Inspiration. The Court finds that the policy interests favor disqualifying Norris and HGC as PDMI’s/In-spiration’s expert consultants in this litigation.
 

 Norris’/HGC’s services as litigation consultants for PDMI/Inspiration create a conflict of interest with Norris’/HGC’s services for the PCG. See,
 
 Conforti,
 
 170 N.J.Super. at 67, 405 A.2d at 489 (finding that strong potential for a conflict of interest and the adverse impact of allowing confidences to be revealed to adversary in the same case weighed in favor of disqualifying expert.) As previously discussed, Norris has already used his knowledge of BHP’s operation and litigation strategy to rebut one of BHP’s expert’s reports to advance PDMI’s position on allocation. The Court finds that the “potential abuse of [BHP’s] confidences and [Norris’] own inability to render [PDMI/Inspiration] an objective expert report makes [Norris’] further employment by [PDMI/Inspiration] legally and morally impossible.”
 
 Conforti,
 
 405 A.2d at 492.
 

 Moreover, as courts have noted, permitting an expert to serve adverse parties could create troublesome incentives for both experts and the retaining parties in the future. First, delegated experts might be inclined to “sell” their opinions to the opposing parties or the “highest bidder” without concern about the potential confidentiality of their previous consultations.
 
 Shadow Traffic v. Superior Court of Los Angeles County,
 
 24 Cal.App.4th at 1081, 29 Cal.Rptr.2d at 701 (1994);
 
 American Protection Ins. Co. v. MGM Grand Hotel-Las Vegas, Inc.
 
 1986 WL 57464 (D.Nev.1986)(“Were the most important witness’ assistance in the litigation to be sold to the highest bidder, the court’s integrity would be discredited [and] the public estimation of the judicial system would be diminished.”) Second, retaining parties might be inclined not to withdraw a previously designated expert while litigation is pending for fear that the party’s confidential infor
 
 *MCCLXX
 
 mation would become available to its adversary.
 
 Id.
 

 The policy objectives which favor disqualifying Norris and HGC outweigh the competing policy objectives. See,
 
 Koch,
 
 85 F.3d at 1181 (policies militating against disqualification include guaranteeing that parties have access to experts who possess specialized knowledge and allowing experts to pursue their callings.) As a member of the PCG, PDMI/Inspiration may still benefit from Norris’ specialized knowledge of the Pinal Creek site in his role as consultant for the PCG. Additionally, PDMI/Inspiration can replace Norris with another consulting expert not affiliated with HGC. See,
 
 Conforti,
 
 170 N.J.Super. at 67, 405 A.2d at 489 (holding that without the assertion that a party will be deprived of the use of an expert if it cannot use its adversary’s expert, the party’s interest is comparatively weak.)
 

 Further, Norris’ disqualification will not prohibit him from pursuing his trade. HGC and Norris may still work for the PCG in this litigation by agreement of all PCG members and for anyone else in any matter other than this litigation. See,
 
 Conforti,
 
 170 N.J.Super. at 72, 405 A.2d at 492 (noting that expert could still offer its services to anyone it chose except to the adverse party in the same litigation.)
 

 Finally, disqualifying Norris and HGC will help preserve the fundamental fairness of the adversary process in this case. See,
 
 Cordy,
 
 156 F.R.D. at 582 (“Any party to a lawsuit who retains an expert should not have to worry that the • expert will change sides in the middle of the proceeding ... [t]o hold otherwise would adversely affect the confidence parties place in the system of justice.”) The unrestrained access which BHP gave Norris to its documents, mining operations, and proprietary information evidences BHP’s belief that it could confide in Norris without fear that he would misuse the information. See,
 
 Conforti & Eisele, Inc. v. New Jersey,
 
 170 N.J.Super. 64, 405 A.2d 487 (1979)(noting that, because party allowed retained expert access to its files, both the party and its attorney felt confident that they could confide in the expert without fear that the expert would in any way misuse the information.) Norris/HGC produced over 100 banker’s boxes of information related to services provided to the PCG. (Tr. 127:3-131:3) In view of the number of years — more than 14 — that Norris has spent reviewing, analyzing, and synthesizing information from the PCG members, it is unreasonable to assume that Norris can ignore the information regarding the PCG and the Pinal Creek site that is contained in his head. Thus, permitting Norris to serve as a litigation consultant for PDMI/Inspiration would necessarily and unfairly permit PDMI/Inspiration access to Norris’ wealth of PCG/BHP information.
 

 PDMI/Inspiration presumably hired Norris because he already had extensive knowledge of the Pinal Creek site. The Court agrees with BHP, that in hiring Norris as an expert consultant, PDMI/In-spiration are exploiting the PCG’s, including BHP’s, investment. See,
 
 Conforti,
 
 170 N.J.Super. at 72, 405 A.2d at 492 (“Just as a former employee should be prevented from disclosing that which took time and expertise to develop, so too should a litigant be prevented from reaping similar benefits within the context of a lawsuit.”) Even if Norris does not disclose any confidential information to PDMI/Inspiration’s experts, PDMI/Inspi-ration “would still obtain the benefit of this confidential information because it ... [shapes], either consciously or unconsciously” Norris’s contribution to PDMI/Inspiration’s experts’ reports.
 
 Id.
 
 (“the very nature of the services which [the expert] provides make it impossible to conceive of a situation in which... [the
 
 *MCCLXXI
 
 expert] could conscientiously discharge its duty to [two adverse parties in the same case.]”) Because “no form of protective order could be truly effective in expunging this knowledge” from Norris’s mind, “the only conceivable means of protecting [BHP’s] interest” is to disqualify Norris and HGC from serving as PDMI/Inspiration’s litigation consultant.
 
 Id.
 
 at 492 (In a suit brought by general contractors regarding a series of construction contracts, the State, a party to the litigation, was granted an injunction prohibiting an engineering firm from serving as the general contractor’s expert for phases of the litigation for which the engineering firm had not been retained by the state because although the engineering firm was only retained by the State for phase II of a multi-phase trial, it had gained access to the State’s files and became privy to the State’s attorney’s views on phases III and V as well.) In conclusion, the Court finds that disqualifying Norris and HGC will help restore the integrity of the adversary process which has been damaged in this case.
 

 CONCLUSION
 

 For the foregoing reasons, the Court will grant BHP’s motion and will disqualify HGC and Norris from serving as consulting experts for PDMI/Inspiration in this litigation. In a separate order subsequent to ruling upon the disqualification motion of Dr. Fetter, the Court will address the appropriate sanctions to impose in this matter.
 

 Accordingly,
 

 IT IS HEREBY ORDERED the Motion of Plaintiff BHP Copper, Inc., to Disqualify James Norris and the Firm Hydro Geo Chem as Litigation Consultants for Phelps Dodge Miami, Inc., and Inspiration Consolidated Copper Company (document # 1348) is GRANTED.
 

 IT IS FURTHER ORDERED that James Norris and the Firm Hydro Geo Chem are prohibited from serving as litigation consultants for Phelps Dodge Miami, Inc. or Inspiration Consolidated Copper Company in the subject litigation but he may serve as a common consultant on issues common to the Pinal Creek Group only upon agreement of all its members.
 

 [1]
 

 . Exhibit B to document # 1348 is the March 27, 2003 transcript of the deposition of James Norris.
 

 [2]
 

 . Exhibit 1 to document # 1380 is the May 22, 2003 Declaration of James Norris.
 

 [3]
 

 . Exhibit C to document # 1348 is the Affidavit of Evelyn Bingham dated April 28, 2003.
 

 [4]
 

 . Citations .to "Tr. page:linepage-line" are to Transcripts of the February 4 and 5, 2004 evidentiary hearing on BHP’s Motion to Disqualify James Norris and Hydro Geo Chem. The relevant portions of the transcript may be found as Exhibit A to BHP's Proposed Findings of Fact and Conclusions of Law, dated February 27, 2004.
 

 [5]
 

 . “Company" is defined in the Consulting Agreement as PDMI, BHP, and Inspiration, collectively known as the PCG.2000 Consulting Agreement, § 1. (document # 1348, Exh. D)
 

 [6]
 

 . The 2000 Consulting Agreement provides that: Work Product means "any and all reports, evaluations, diagrams, designs, inventions, creations, expressions, improvements, computer programs, specifications and all other documentation, whether or not patenta
 
 *MCCLVII
 
 ble or copyrightable, that are first conceived, made or actually or constructively reduced to practice during the performance of Services or within 6 months following the termination of the Supplement, and that relate in any way to the Contract Documents or are based in whole or in part on or derived from information supplied by Company, whether preliminary or final, and on whatever media rendered.” (document # 1348, Exh. D at § 1)
 

 [7]
 

 . Norris testified that remedial investigation “defines the nature and extent of contamination, the potential migration pathways for contamination, and sometimes the potential risk or receptors to complete exposure pathways.” (Tr. 183:24-184:2)
 

 [8]
 

 . Each member of the PCG is independently responsible for source control work which addresses potential sources of contamination on each member’s own property. (Tr. 33:5-33:16, 49:10-51:18, 241:8-241:9)
 

 [9]
 

 . Citations to "hearing exhibit” are to exhibits admitted during the February 4-5, 2004 evidentiary hearing.
 

 [10]
 

 . Matt Wickham works for Golder Associates which was employed as a consultant for PDMI/Inspiration. (Tr. 117:8-117:19) Mark Logsdon was an employee of Geochemica, consultants for PDMI/Inspiration. (Tr. 156:18-156:25)
 

 [11]
 

 . Exhibit E to document # 1348 is the transcript of the April 11, 2003 deposition of Charles W. Fetter.
 

 [12]
 

 . In view of the limited amount of case law regarding expert disqualification, the Court has looked beyond the Ninth Circuit for guidance.