Eric **RODRIGUEZ**, et al., Plaintiffs,

v.

George E. **PATAKI**, et al., Defendants.

Howard T. **Allen**, et al., Plaintiffs,

v.

George E. Pataki, et al., Defendants.

No. 02 CIV. 618 (RMBFM),
02 CIV. 3239 RMBFM.

United States District Court,
S.D. New York.

Sept. 22, 2003.

---

Richard D. Emery, Emery Celli Cuti Brinckerhoff & Abady, P.C., New York, for Plaintiffs.

Joan P. Gibbs, Rivers, Mealy, Cransnow & Bradford, Brooklyn, NY, for Plaintiff-Intervenors.

Michael Carvin, Jones, Day, Reavis & Pogue, Washington, DC, for Def. Bruno.

C. Daniel Cuill, Graubard Miller, New York, NY, for Def. Silver.

## DISCOVERY ORDER

MAAS, United States Magistrate Judge.

Discovery in this case is scheduled to end on September 26, 2003. As the deadline nears, the parties have inundated the Court with motion papers. I attempted to contact lead counsel earlier this week to provide oral rulings with respect to at least some of the parties' concerns, but was unable to set up a telephone conference. Accordingly, this Discovery Order sets forth my disposition of each remaining issue of which I am aware.

### A. *Burgeson and Morrison Expert Reports*

Following the referral of these cases to me, the plaintiffs sought to substitute Professor Michael McDonald as one of their racial block voting experts. The defendants did not object to this request, but asked that they be given additional time to submit their rebuttal reports. In an effort to keep discovery moving, I directed that the defendants serve any of their rebuttal expert reports which were "not affected" by the plaintiffs' change of experts by August 26, with their remaining reports to be served by September 12, 2003. (*See* Docket No. 236 (Order dated Aug. 20, 2003)). Thereafter, the defendants did not serve any expert reports in August.

Having reviewed the reports served in September, the plaintiffs contend that the expert reports of Mark Burgeson, a LATFOR staff member, and Peter A. Morrison, a demography consultant, do not respond to Professor McDonald's racial block voting analysis and are therefore untimely. (*See* letter dated Sept. 16, 2003, from Richard D. Emery, Esq., to the Court, at 1–2). Accordingly, the plaintiffs ask that the Burgeson and Morrison reports be stricken, and that these witnesses be precluded from testifying. In their opposing papers, the defendants deny the plaintiffs' allegations regarding their purported noncompliance with my order. (*See* letter dated Sept. 18, 2003, from John R. Braatz, Esq., to the Court, at 2–4). Additionally, the defendants have cross-moved to strike any portions of the McDonald report which do more than correct errors in the ecological inference calculations of the plaintiffs' former racial block voting expert. The prior expert's errors in connection with those calculations were the basis for the plaintiffs' original application to substitute a new expert.

The decision to strike an expert's report is obviously one which should not be made without a showing of good cause. Here, the defendants argue that they were entitled to delay the production of all of their expert reports because the plaintiffs' belated production of the McDonald report adversely "affected" their pretrial planning. (*See id.* at 4). They cite as an example their need to "reschedule depositions ... while preparing for impending discovery and summary judgment deadlines." (*Id.*). This strained reading of the August 20 order clearly does not justify the defendants' delay.

■ The defendants also argue, however, that the McDonald report necessitated substantive changes in the Burgeson and Morrison reports which entitled them to delay their delivery. In an effort to determine whether this argument holds water, I reviewed all three reports. Although the Morrison and Burgeson rebuttal reports appear to address the question of racial block voting only tangentially, the plaintiffs have not established that the decision to delay the delivery of the Burgeson and Morrison reports constitutes a clear and knowing violation of my order. Accordingly, while it certainly appears that the defendants have engaged in some gamesmanship, their conduct does not warrant the drastic remedy of striking the Morrison and Burgeson reports.

■ By the same token, although the plaintiffs withdrew their original racial block voting expert's report because it contained certain errors regarding ecological inference, Mr. Emery never represented that the changes in a substitute report would be limited to that area. There consequently is no basis for this Court to strike any aspect of the McDonald report.

## B. *Burgeson Deposition*

On September 5, 2003, pursuant to Court order, the plaintiffs deposed Mark Burgeson as a fact witness in an effort to shed further light on the workings of LATFOR. The following week, the defendants served the Burgeson expert report, which addresses the impact of the 2002 Senate redistricting plan, of which he was a principal architect, on minorities. By agreement among counsel, Burgeson was scheduled to be deposed as an expert witness on September 19, 2003, but, on the eve of that deposition, the defendants unilaterally cancelled his appearance, stating that their decision to do so was based upon the plaintiffs' "request that the Court preclude his trial testimony and strike his expert report from the record." (*Id.* at 4).

■ The Burgeson expert witness deposition should not have been cancelled. Nevertheless, the defendants' decision to designate him as an expert does not amount to a waiver of their legislative privilege with respect to any documents on Senator Bruno's privilege log that I previously have held need not be disclosed. His designation as an expert also does not open the door for the plaintiffs to inquire into the reasons why he and others in the Senate majority redistricting office drew the lines for particular Senate districts in the ways that they did.

Mr. Carvin previously had agreed that Burgeson could be deposed as an expert, subject to any privilege claims that the defendants were entitled to assert. (*See* Sept. 11, 2003 Tr. at 29)("If you want to depose him next week as an expert, that's fine."). Instead of proceeding in that manner, however, the defendants chose to cancel the Burgeson deposition without consulting the Court. Because there was no legitimate basis for that decision, the defendants are directed to make Burgeson

available *at the plaintiffs' convenience* prior to the discovery deadline.

## C. *Other Delayed Depositions*

█ It appears that the plaintiffs themselves delayed several fact witness depositions because the parties' objections to certain of my rulings concerning document discovery had not yet been resolved by the three-judge court. Recognizing that such delays were a luxury that the parties could ill afford, I expressly cautioned counsel, during a September 11, 2003, telephone conference, to "do as much of [each] deposition as you can and then if there are rulings that result in [the] disclosure of further documents, finish it up." (*See* Sept. 11, 2003 Tr. at 11). At other times, I stated that the parties' depositions would have to be conducted on multiple tracks to meet the discovery deadline. Despite these remarks, and Judge Berman's clear indication that the September 26 discovery deadline would not be further extended, it appears that relatively few fact witnesses have been deposed. Counsel are therefore instructed to confer *immediately* to develop a schedule for this last week of discovery which ensures that the maximum number of key fact witnesses are deposed.

## D. *Angelo Falcone Report*

█ In prior conferences, Mr. Carvin agreed that the defendants would not object to the submission of a revised expert report by expert witness Angelo Falcone, provided that it did nothing more than annex material which was referenced in his original report. The defendants maintain that the revised Falcone report submitted by PRLDF goes far beyond the limited modifications that the defendants agreed were acceptable. (*See* letter dated Sept. 16, 2003, from Louis K. Fisher, Esq., to the Court).

The original Falcone report referred to official New York State government reports which allegedly acknowledge that discrimination is a significant problem for Latinos. In the revised report, the two additional paragraphs to which the defendants object indicate that Latinos in New York City have historically been the victims of discrimination in many aspects of their lives. Of far greater importance, Mr. Falcone relies upon a number of documents not previously referenced in his report, including an extensive study of the relationship between the Latino community and New York City government.

As the defendants correctly observe, through this subterfuge the revised report significantly expands the potential scope of Mr. Falcone's expert testimony. Although PRLDF contends that the defendants have suffered no prejudice because they had three weeks to prepare and serve their rebuttal report, this argument wholly misses the mark. The only modification of the report that the Court allowed was a nonsubstantive one. The changes that actually were made could substantially alter Mr. Falcone's testimony and, therefore, violate the limited leave granted by the Court with the defendants' consent.

Accordingly, the revised Falcone report is stricken. Mr. Falcone may, of course, testify at trial with respect to the more limited opinions set forth in his original report.

## E. *Addition of Congressman Meeks as a Defense Witness*

On August 7, 2003, the defendant-intervenors served a Rule 30(b)(6) deposition notice on plaintiff COBED. The notice sought the testimony of a COBED representative concerning several topics, including COBED's decision to intervene in this litigation. In their notice, the defendants instructed COBED to produce "the person

or persons most knowledgeable" about these subjects. Thereafter, at the deposition, Assemblywoman Annette Robinson testified on behalf of COBED that Congressman Gregory Meeks was the person most knowledgeable about several of the subjects set forth on the deposition notice. Based on this testimony, the defendant-intervenors seek to add the Congressman to their witness list. (*See* Sept. 19, 2003 letter from Cassandra F. Lentchner, Esq., to the Court).

■ Notwithstanding the wording of the Rule 30(b)(6) notice, it is settled law that a party need not produce the organizational representative with the greatest knowledge about a subject; instead, it need only produce a person with knowledge whose testimony will be binding on the party. See *Gucci Am., Inc. v. Exclusive Imports Int'l*, 2002 WL 1870293, at *8–*9 (S.D.N.Y. Aug.13, 2002)(Casey, J., *aff'g* Maas, Mag. J.); *Cruz v. Coach Stores, Inc.*, 1998 WL 812045, at *6 (S.D.N.Y. Nov.18, 1998), *aff'd in part, vacated in part on other grounds*, 202 F.3d 560, 573 (2d Cir.2000). In their papers, the defendant-intervenors have not shown that Assemblywoman Robinson was insufficiently knowledgeable to serve as COBED's Rule 30(b)(6) witness. Accordingly, the fact that Congressman Meeks may have been a better witness does not warrant his addition to the witness list at this late date.

F. *Disqualification of Dr. Lisa Handley*

One of the plaintiffs' expert witnesses is Dr. Lisa Handley, whose testimony will likely focus on a statistical racial block voting analysis. The defendants seek to disqualify Dr. Handley because she previously was retained as an expert by both the New York State Assembly and a referee appointed by the state court in the *Allen* action before it was removed to this Court. (*See* Docket No. 226 (Def'ts' Mem. of L.)). (My understanding is that the *Allen* action concerned a Congressional redistricting plan developed by the New York Legislature which is no longer at issue in this litigation.)

■ The Court has the inherent power to disqualify an expert witness when such relief is warranted. *Paul v. Rawlings Sporting Goods, Co.*, 123 F.R.D. 271, 277–78 (S.D.Ohio 1988). Where the disqualification is sought because the expert previously was retained by another party, the movant bears the burden of establishing (1) that it was objectively reasonable for the movant to believe that it had a confidential relationship with the expert and (2) that the movant's confidential information was in fact disclosed to the expert. *Topps Co. v. Productos Stani Sociedad Anomina Indus. y Commercial*, 2001 WL 406193, at *1 (S.D.N.Y. Apr.20, 2001)(Gorenstein, Mag. J.); *Paul*, 123 F.R.D. at 278.

■ The record establishes that the Assembly formally retained Dr. Handley in 2001 to provide various services, including testimony at "depositions and . . . such other appearances in the pre-clearance process or in any ongoing litigation relating to [redistricting] plans as may be requested by the Assembly." (*See* Def'ts' Mem. in Support of Mtn. to Disqualify ("Def'ts' Mem."), Ex. A at 1). The first element of the showing required to disqualify Dr. Handley therefore has been met.

As to the second element, which requires disclosure of confidential information to the expert during the course of the consulting relationship, the defendants' memorandum of law alleges that Dr. Handley was "entrusted with confidential data, analyses and information" concerning the "thought processes" of Assembly employees and one of the Assembly's other

"outside experts." (Def'ts' Mem. at 2). As part of their motion papers, the defendants did not proffer any affidavit to support this conclusory assertion. Instead, the defendants pointed to the Assembly's log of privileged documents, suggesting that it established that such confidential communications had occurred. (*Id.* at 5 & Ex. B).

Contrary to the defendants' suggestion, the privilege log does not demonstrate that Dr. Handley received any confidential information that she now seeks to use to their disadvantage. Indeed, many of the "privileged" documents set forth on the log are not privileged at all. (*See, e.g.,* Jan. 8, 2003 email from Dr. Handley to an Assembly employee: "Okay, I drop my sons off at school, but I'm home from 9:30 until 11:30[,] then from noon on."). Others reflect Dr. Handley's thought processes, rather than those of the defendants, and will, if anything, be helpful to the defendants in connection with cross-examination. (*See, e.g.,* July 2, 2001 email from Dr. Handley to an Assembly employee: "I do most of my work in SPSS (double regression, scatterplots, etc[.]), then save a much smaller database out using the report and export functions.")

Although the log contain references to planned meetings with the Assembly's counsel, the underlying documents do not establish that the defendants divulged any privileged or confidential information to Dr. Handley when those meetings took place. Moreover, the notion that Dr. Handley received confidential information regarding the Senate plan during the course of those meetings is belied by the parties' prior motion practice, which established that the Senate and Assembly majority redistricting offices operated as separate fiefdoms, with no interoffice communications of substance. It therefore seems unlikely that the Assembly majority

could have given Dr. Handley any confidential information relevant to the Senate redistricting plan.

In an effort to make the requisite showing, the defendants submitted to the Court without authorization a "reply" declaration which alleges that Dr. Handley engaged in communications with "Assembly representatives, including outside counsel and other outside experts," during which she received "confidential" information "regarding [their] analyses, thought processes, and deliberations concerning racial voting patterns in New York." (Decl. of Roman Hedges, dated Sept. 8, 2003, ¶ 4). Even if I were to consider this belated submission, Dr. Hedge's conclusory statements would plainly be insufficient to meet the defendants' burden. *See, e.g., Topps Co.,* 2001 WL 406193, at *2–*3; *In re Ambassador Group, Inc., Litig.,* 879 F.Supp. 237, 243 (E.D.N.Y. and S.D.N.Y.1994).

 The defendants also seek to disqualify Dr. Handley because she was previously retained by a state court referee in connection with the drafting of New York's Congressional redistricting plan. They maintain that the rules of conduct applicable to a judge also apply to a referee and, by extension, to his agents. (*See* Def'ts' Mem. at 6)(citing *In re Joint Eastern and Southern Districts Asbestos Litig.,* 737 F.Supp. 735, 739 (E.D.N.Y. and S.D.N.Y. 1990)). Prior service as a court-appointed expert, however, should not disqualify someone from appearing in similar cases in the future. Here, Dr. Handley's retention by Referee Bialkin related to *Congressional* redistricting, which, does not appear to be the subject of her proposed testimony. Moreover, Dr. Handley has submitted her own sworn statement, in which she avers that in the course of her work for the state court, she "never reviewed, analyzed or gave expert advice [regarding] the Senate plan that is the subject of this litigation."

(Decl. of Dr. Lisa Handley, dated Aug. 25, 2003, ¶ 12). Dr. Handley's work for the state court also was completed before the plaintiffs engaged her to testify on their behalf in these cases.

In these circumstances, the defendants have not shown that Dr. Handley's disqualification is necessary to preserve the confidentiality of their thought processes or the public's confidence in the integrity of its judiciary. The motion to disqualify Dr. Handley from testifying on behalf of the plaintiffs is therefore denied.

### G. *Objections*

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, parties may file objections to a magistrate judge's rulings concerning nondispositive matters within ten days after being served with a copy of the magistrate judge's order. In this litigation, by agreement of the parties, this time period has in the past been truncated in recognition of the limited time available for discovery. It obviously is not feasible to allow the parties ten—or even three—days to object to the rulings set forth in this Discovery Order since the discovery period will end on Friday, September 26, 2003. Accordingly, unless the three-judge court otherwise directs, counsel are instructed to serve and file their objections, if any, to this Discovery Order by *noon* on Tuesday, September 23, 2003. Additionally, I note that neither Rule 72 nor 28 U.S.C. § 636(b) contemplates the submission of responses to objections. For that reason, unless the three-judge court otherwise directs, responses to any further objections filed by the parties should not be submitted.

SO ORDERED.