**HEWLETT–PACKARD COMPANY,**
Hewlett–Packard Development
Company, L.P., Plaintiffs,

v.

**EMC CORPORATION, Defendant.**

EMC Corporation, Counterclaimant,

v.

Hewlett–Packard Company, Hewlett–Packard Development Company, L.P., Compaq Computer Corporation, Counterdefendants.

No. C 02–04709 JF, 169.

United States District Court,
N.D. California,
San Jose Division.

Aug. 10, 2004.

Robert T. Haslam, Amy Kathleen Van Zant, Heller, Ehrman, White & McAuliffe LLP, Menlo Park, CA, Chris Landgraff, Mark E. Ferguson, Barlitt Beck Herman Palenchar & Scott, Chicago, IL, Michael K. Plimack, Heller, Ehrman, White & McAuliffe LLP, San Francisco, CA, for Plaintiff.

Stephen N. Adams, Chris R. Ottenweller, I. Neel Chatterjee, Mark R. Weinstein, Todd Michael Briggs, Orrick Herrington & Sutcliffe LLP, Menlo Park, CA, Lisa C. Ward, Orrick Herrington & Sutcliffe LLP, Irvine, CA, for Defendant.

## ORDER DENYING MOTION TO DISQUALIFY EXPERT WITNESS [1]

FOGEL, District Judge.

Defendant moves to disqualify Plaintiffs' expert witness. Plaintiffs oppose the motion. The Court has read the moving and responding papers and has considered the oral arguments presented by counsel at the hearing on May 10, 2004. For the reasons set forth below, the motion will be denied.

## I. BACKGROUND

Plaintiffs Hewlett–Packard Company et al. ("HP") filed suit against Defendant EMC Corporation ("EMC") on September 30, 2002, alleging infringement of several of the claims of seven patents. EMC counterclaimed, alleging that HP infringed several of the claims of five of EMC's patents. The patents at issue generally relate to devices, systems, and methods for storing or backing up electronic data on memory systems. The parties intend to use expert witnesses to describe the claimed inventions and the underlying technology in their pretrial motions as well as at trial.

EMC asserts that HP's expert witness Randy Katz ("Katz") must be disqualified because he allegedly "previously served as a consultant for EMC, at which time he received confidential information on EMC's trial strategies relating to one of the patents in suit." Motion to Disqualify HP Expert Randy Katz ("Motion"), p. 1. The alleged consultation occurred in a separate case in the District of Massachusetts, in which EMC was adverse to StorageApps, a company that HP acquired in July 2001. *See* Declaration of Peter M. Dichiara in Support of Defendant EMC Corporation's Motion to Disqualify HP Expert Randy Katz ("Dichiara Decl."), ¶ 9 & Ex. F. The subject matter of the Massachusetts litigation included alleged infringement of claims of United States Patent Number 5,544,347, a patent at issue in the present action. Dichiara Decl., Ex. A. EMC claims that Katz has "switched sides" in the course of litigation, thus prejudicing EMC.

While the parties dispute the extent to which Katz actually consulted for EMC, it is undisputed that Katz and EMC's counsel, including Peter Dichiara ("Dichiara"), participated in a telephone conversation on March 20, 2001, in which counsel and Katz discussed, at the very least, the possibility that Katz might assist EMC in its litigation against StorageApps. *Id.* ¶ 3; Declaration of Randy H. Katz Relating to Opposition to Katz Disqualification ("Katz Decl."), ¶ 6. Dichiara asserts that the topics that he and Katz discussed included impressions of the patents, specific claim limitations and prior art, the accused inventions, the type of evidence needed to prove infringement, and the names and qualifications of other potential expert witnesses. *Id.* ¶ 4. Katz characterizes the conversation differently. First, he represents that he conducted a "cursory read" of five or six EMC patents for "no more than three hours" in order to "make a preliminary examination . . . to understand the basis of their invention." Katz Decl., ¶¶ 4–5. Then, according to Katz, in the March 20, 2001 telephone conversation with Dichiara, which lasted approximately one hour, he told Dichiara how he "felt about each patent" in order to determine whether the "patents were sufficiently 'well-formed' that [he] could agree to work on EMC's behalf." *Id.* ¶ 6. Katz thus

---

1. Defendant also moves to strike a declaration submitted by the expert in connection with a claim construction hearing.

claims that his consultation with EMC was limited to half a day's work, the sole goal of which was to decide whether he wanted to assist EMC at all. *See id.* ¶¶ 4–11.

Katz asserts further that he mentioned very briefly potential issues related to validity, but not infringement, of the patents. He states explicitly that he has "no recollection of discussing any infringement issues with EMC's lawyers" during the March 20, 2001 telephone conversation, *id.* ¶ 7, and that "EMC's lawyers may have referred to particular claim language and asked me whether such language reassured me about the novelty of the claimed invention," *id.* ¶ 6. He states that infringement could not have been discussed "likely because at the time of the March 20, 2001 conversation, I had only very briefly reviewed the StorageApps website, primarily to discover what the company did as I was unfamiliar with the company and its accused products." *Id.* ¶ 6. Katz describes discussions as largely one-sided: "I do not recollect that EMC's lawyers discussed any litigation strategy with me during the March 20, 2001 conversation [or disclosed] their impressions of the patents to me." *Id.* ¶ 8.

On April 12, 2001, Katz signed an agreement to consult for EMC with respect to the patent infringement litigation and to "maintain in confidence all information [that he] receive[s] or produce[s] in connection with this matter, and ... discuss the subject matter of this litigation only with attorneys from Hale and Dorr LLP, Bowditch & Dewey, LLP, and EMC Corporation." Dichiara Decl., Ex D. Katz thus agreed in writing to keep any *future* discussions with EMC's counsel confidential. Based on the March 20, 2001 telephone conversation and the April 12, 2001 agreement, EMC concludes that "Katz agreed both orally and in writing to preserve EMC's confidential information." Motion, p. 1.

Dichiara represents that he spoke to Katz about the case pending in the District of Massachusetts several times between March 2001 and July 2002 and that he sent Katz several boxes of material to review. Dichiara Decl., ¶¶ 7, 12. Katz, however, declares that he was not contacted by EMC or its counsel for fifteen months subsequent to April 12, 2001. Instead, he claims that *he* called *them*—for only a "few minutes" each time—to confirm that the case was active and that "[a]t no time during these conversations did [he] discuss the substance of the case or EMC's strategy concerning the case with EMC's lawyers." Katz Decl., ¶¶ 10–11. He recalls being told that the case was "on hold." *Id.* ¶ 10. During the course of his relationship with EMC, Katz submitted a bill to Dichiara—and EMC paid—only for "one half day [spent] reviewing patent documents and in discussions with Attorney Dichiara"; that is, for the initial telephone conversation and his preparation for it. Dichiara Decl., Ex. E; Katz Decl., ¶ 16. On December 20, 2001, Katz signed a protective order in the Massachusetts case, in which he agreed "to refrain from substantive involvement in the prosecution of patents for or on behalf of either of the parties during this litigation and for two years following the conclusion of the trial in this action." Dichiara Decl., Ex. G.

In "the latter part of 2001," Katz, "knowing that there was no activity in the EMC versus StorageApps case, agreed to serve as an expert of Hitachi" in separate litigation. Katz Decl., ¶ 12. In late April 2002, EMC's counsel sent Katz three boxes of material to review. However, Katz represents that because he was so busy with the Hitachi litigation he never opened these boxes. *Id.* ¶ 13. After returning from an engagement relating to the Hitachi litigation in the middle of June 2002, Katz decided that he "did not want to continue as a consultant for EMC" because

he "was concerned that [he] had been engaged by EMC not to provide any substantive work for EMC, but rather so that EMC could prevent [him] from becoming adverse to it at any time in the future." *Id.* ¶ 14. Katz formally withdrew from his retention agreement with EMC on July 11, 2002, at which time he returned the two-thousand-dollar payment that he had received for the half-day of work in March 2001. *Id.* ¶¶ 15–16; Dichiara Decl., ¶ 14. Katz told Dichiara at that time that he had not reviewed the materials in the three boxes. Dichiara Decl., ¶ 13. According to Dichiara, Katz told EMC's counsel in June 2002 that he wished to cease consulting for EMC because he did not have enough time. *Id.*

EMC contends that Katz began representing its adversaries in a separate case "within weeks" after withdrawing. Motion, p. 2. However, EMC's counsel in the present action assert that they did not learn until March 2004 that Katz previously had consulted for EMC and that HP did not disclose Katz as an expert witness until January 26, 2004. *Id.* at 3. EMC argues that HP has not disclosed the nature of the information that Katz has provided to HP. *Id.* HP continues to use Katz's services and disputes EMC's characterization of Katz's role in the previous litigation. EMC filed the present motion on March 30, 2004, one week before the claim construction hearing and long after the parties' joint claim construction and prehearing statement and subsequent briefs were filed.

## II. LEGAL STANDARD

 Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system. *See Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th Cir.1980) ("A district court is vested with broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial ... including disqualifying expert testimony."); *Erickson v. Newmar Corp.,* 87 F.3d 298, 300 (9th Cir.1996) (commenting favorably on—without applying—rules that other courts have applied in cases in which a party seeks disqualification of an expert witness for "switching sides"); *Koch Ref. Co. v. Jennifer L. Boudreaux M/V,* 85 F.3d 1178, 1181 (5th Cir.1996); *Crenshaw v. Mony Life Ins. Co.,* 318 F.Supp.2d 1015 (S.D.Cal.2004); *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.,* 202 F.R.D. 426 (E.D.Pa.2001); *United States ex rel., Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.,* 994 F.Supp. 244, 248 (D.N.J.1997). However, disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely. *See Koch Ref. Co.,* 85 F.3d at 1181; *United States v. Salamanca,* 244 F.Supp.2d 1023, 1025 (D.S.D.2003); *Proctor & Gamble Co. v. Haugen,* 184 F.R.D. 410, 413 (D.Utah 1999); *Palmer v. Ozbek,* 144 F.R.D. 66, 67 (D.Md.1992). It is important to remember that the "expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than do attorneys. Experts are not advocates in the litigation but sources of information and opinions." *English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F.Supp. 1498, 1501 (D.Colo.1993) (internal citation omitted); *see also In re Ambassador Group, Inc., Litig.,* 879 F.Supp. 237, 242 (E.D.N.Y.1994).

 Although courts have declined to use a brightline rule to determine whether an expert should be disqualified, *see, e.g., Koch Ref. Co.,* 85 F.3d at 1181, they have articulated general principles. In particular, disqualification of an expert is war-

ranted based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation. *See Wang Labs., Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991). However, if only one of the two factors is present, disqualification likely is inappropriate. *See Greene, Tweed of Delaware, Inc.,* 202 F.R.D. at 429; *English Feedlot, Inc.,* 833 F.Supp. at 1502 (If "any confidential disclosures were undertaken without an objectively reasonable expectation that they would be so maintained (hence, any confidentiality was waived), or if, despite a relationship conducive to such disclosures, no significant disclosures were made, disqualification is inappropriate."). In addition to these two factors, the Court also should consider whether disqualification would be fair to the affected party and would promote the integrity of the legal process.

## A. Confidential Relationship

 The party seeking disqualification of an expert witness bears the burden of demonstrating that it was reasonable for it to believe that a confidential relationship existed, *Mayer v. Dell,* 139 F.R.D. 1, 3 (D.D.C.1991), "and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate," *Pinal Creek Group v. Newmont Mining Corp.,* 312 F.Supp.2d 1212, 1223 (D.Ariz. 2004). In evaluating the reasonableness of the party's assumption, the Court may consider many factors, including

whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving

party funded or directed the formation of the opinion to be offered at trial. *Stencel v. Fairchild Corp.,* 174 F.Supp.2d 1080, 1083 (C.D.Cal.2001). Other factors include whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party. *See, e.g., Mayer,* 139 F.R.D. at 2–3; *Paul,* 123 F.R.D. at 280. The emphasis, as stated above, is not on whether the expert was retained per se but whether there was a relationship that would permit the litigant reasonably to expect that any communications would be maintained in confidence. *See, e.g., In re Ambassador Group, Inc., Litigation,* 879 F.Supp. at 243.

 There likely is a long term relationship when the "record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of operations, decision-making process, and the like." *Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588, 591 (D.Minn. 1986). In contrast, there probably was no more than an informal consultation when "the expert met but once with counsel, was not retained, was not supplied with specific data relevant to the case and was not requested to perform any services," *Mayer,* 139 F.R.D. at 3, or when the party "did not provide the [expert] specific facts about the case or confidential documents to review [or] discuss critical litigation strategy," *Mays v. Reassure Am. Life Ins.*

*Co.,* 293 F.Supp.2d 954, 957 (E.D.Ark. 2003). The facts may fall between these two extremes. For example, if the expert met with opposing counsel only once but was retained, it is not clear whether such a meeting is best characterized as a type of informal consultation or the commencement of a long-term relationship. Disqualification thus may not be warranted even if the expert witness has signed a confidentiality agreement with the adversary. *See Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 278 (S.D.Ohio 1988) ("[T]here may be situations where, despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification."). Alternatively, "a confidential relationship can exist absent a confidentiality agreement between the retaining party and the expert." *Pinal Creek Group,* 312 F.Supp.2d at 1223; *see also Shadow Traffic Network v. Superior Court,* 24 Cal. App.4th 1067, 29 Cal.Rptr.2d 693, 700 (1994). For example, although the expert may have accepted the engagement, he or she may not have commenced the relationship. *See, e.g., In re Ambassador Group, Inc., Litig.,* 879 F.Supp. at 243. Similarly, a confidential relationship is not necessarily established just because some information concerning the litigation is shared. *See, e.g., Larson v. Rourick,* 284 F.Supp.2d 1155, 1158 (N.D.Iowa 2003) ("To get to the point where an attorney expert is comfortable proceeding to the step of reviewing factual information, the plaintiffs' counsel must necessarily review certain basic facts and theories concerning the litigation.").

**B. Confidential Information**

■ Confidential information essentially is information "of either particular significance or [that] which can be readily identified as either attorney work product

or within the scope of the attorney-client privilege." *Paul,* 123 F.R.D. at 279; *see also Pinal Creek Group,* 312 F.Supp.2d at 1224; *United States ex rel., Cherry Hill Convalescent Ctr., Inc.,* 994 F.Supp. at 251; *Mayer,* 139 F.R.D. at 3. It could include discussion of the party's "strategy in the litigation, the kinds of experts [the party] expected to retain, [the party's] view of the strengths and weaknesses of each side, the role of each of the [party's] experts to be hired and anticipated defenses." *Mayer,* 139 F.R.D. at 4; *see also Pinal Creek Group,* 312 F.Supp.2d at 1224. Thus, at least one court has concluded that "[c]ommunication based upon technical information as opposed to legal advice is not considered privileged." *Nikkal Indus., Ltd. v. Salton, Inc.,* 689 F.Supp. 187, 191–92 (S.D.N.Y.1988).

■ "Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged." *Stencel,* 174 F.Supp.2d at 1083. Because the burden is on the party seeking to disqualify the expert, that party should point to specific and unambiguous disclosures that if revealed would prejudice the party. *See, e.g., Mays,* 293 F.Supp.2d at 957 (requiring more than "vague assertions"); *In re Ambassador Group, Inc., Litigation,* 879 F.Supp. at 243.

**C. Fundamental Fairness and Prejudice**

■ The Court also should consider issues of fundamental fairness, *see, e.g., Pinal Creek Group,* 312 F.Supp.2d at 1222; *Paul,* 123 F.R.D. at 280 (asking whether the moving party was unduly disadvantaged and the opposing party unduly advantaged), and whether any prejudice might occur if an expert is or is not disqualified, *see, e.g., Stencel,* 174 F.Supp.2d

at 1083; *United States ex rel., Cherry Hill Convalescent Ctr., Inc.*, 994 F.Supp. at 251. Thus, the Court may ask not only whether there is the appearance of a conflict of interest, but also "whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert." *United States ex rel., Cherry Hill Convalescent Ctr., Inc.*, 994 F.Supp. at 251. "[T]he interest in disqualification must substantially outweigh the interest in nondisclosure and disqualification of the expert." *Proctor & Gamble Co.*, 184 F.R.D. at 414. Consideration of prejudice is especially appropriate at late stages in the litigation, at which time disqualification is more likely to disrupt the judicial proceedings. *See, e.g., United States ex rel., Cherry Hill Convalescent Ctr., Inc.*, 994 F.Supp. at 252.

## D. Policy Concerns

■ It is important to consider other policy concerns in order to achieve the goal of protecting the integrity of the adversary process and of promoting public confidence in the legal system. Such concerns include consideration of the parties' strategic positions, *see Grant Thornton, LLP v. Fed. Deposit Ins. Corp.*, 297 F.Supp.2d 880, 882 (S.D.W.Va.2004); *W.R. Grace & Co. v. Gracecare, Inc.*, 152 F.R.D. 61, 64 (D.Md. 1993), and avoidance of creating "troublesome incentives for both experts and the retaining party," *Pinal Creek Group*, 312 F.Supp.2d at 1227. For example, if experts are permitted to breach confidentiality agreements, they might be motivated "to sell their opinions to the opposing parties or the highest bidder without concern about the potential confidentiality of their previous consultations." *Id.* The retaining party might be motivated "not to withdraw a previously designated expert while litigation is pending for fear that the party's confidential information would become available to its adversary." *Id.* at 1227–28. However, if "experts are too easily disqual-

ified, unscrupulous attorneys may attempt to create relationships with numerous potential experts at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance." *Stencel,* 174 F.Supp.2d at 1083; *see also English Feedlot, Inc.*, 833 F.Supp. at 1505; *Paul,* 123 F.R.D. at 281–82.

## E. Application to the Present Case

Although none of the cases discussed provides binding authority with respect to the precise question at issue here, the reasoning of the cases is sound, and this Court will be guided by it. All of the interests identified—the integrity of the judicial process, avoidance of conflicts of interest, ensuring access to expert witnesses with specialized knowledge, and allowing experts to pursue their professional calling—serve to promote public confidence in the legal system. The Court thus will consider the following questions in deciding whether to disqualify Katz. First, has the moving party demonstrated that it was objectively reasonable for it to conclude that a confidential relationship existed between it and the expert? That is, did the confidential relationship develop into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate? Second, did the moving party disclose confidential information to the expert during such a confidential relationship that is relevant to the current litigation? Third, will the Court's decision be prejudicial or fundamentally unfair to either of the parties? Fourth, to what extent do the policies of allowing experts to pursue their trade, allowing parties to select their own experts, and preventing parties from creating conflicts solely for the purposes of preventing their adversary from using the services of the expert outweigh the policy of preventing conflicts implicated on the particular facts of the case? Finally, considering all of the above

factors together, would disqualification of the expert promote the integrity of the legal process? The moving party bears the burden of proof with respect to each of these factors. *See Koch Ref. Co.*, 85 F.3d at 1181; *Rodriguez v. Pataki*, 293 F.Supp.2d 305, 312 (S.D.N.Y.2003) (requiring the moving party to proffer evidence and stating that a conclusory assertion is insufficient); *Cordy v. Sherwin–Williams Co.*, 156 F.R.D. 575, 580 (D.N.J.1994); *In re Malden Mills Indus., Inc.*, 275 B.R. 670, 673 (Bkrtcy.D.Mass.2002). "[T]he party requesting disqualification may not meet its burden with mere conclusory or *ipse dixit* assertions." *Greene, Tweed of Delaware, Inc.*, 202 F.R.D. at 429 (internal citation omitted).

## III. DISCUSSION

First, EMC must demonstrate that it reasonably believed that it had a confidential relationship with Katz. Katz states that he conversed with Dichiara on March 20, 2001 to assess whether he wanted to consult for EMC. It is undisputed that Katz agreed to consult for EMC, signing a confidentiality agreement on April 12, 2001 memorializing their relationship. It clearly was reasonable for EMC to assume that a confidential relationship began on April 12, 2001, and HP does not dispute that such a relationship existed as of that date. EMC thus has met its burden with respect to any confidential disclosures made between April 12, 2001 and July 11, 2002, the date that Katz withdrew from the consulting agreement.

■ However, EMC has not met its burden with respect to the period prior to April 12, 2001. While it is true that a party may have a reasonable expectation that a confidential relationship exists even absent a formal agreement, EMC has not demonstrated that it had a confidential relationship with Katz prior to the signing of the confidentiality agreement. Katz asserts that he spent only three hours reading six published patents and just one hour (about ten minutes per patent) discussing his impressions of the patents with EMC's counsel. He states that EMC's lawyers did not discuss any litigation strategy and did not disclose their impressions of the patents to him. He represents that, at most, EMC's counsel inquired about his impressions of the validity of the patent claims and that he does not remember discussing litigation strategy or infringement. Although Dichiara states that "[i]t was my understanding that Dr. Katz would hold in confidence all of our discussions and not disclose them without my permission," Dichiara Decl., ¶ 3, Dichiara has provided no evidence contradicting Katz's statements that they did not discuss the accused inventions, the type of evidence needed to prove infringement, and other potential expert witnesses. Moreover, it strains credulity to argue that, only a few weeks after contacting an potential expert witness, EMC's counsel would disclose aspects of its litigation strategy to someone who had not yet signed a confidentiality agreement and that such a conversation could have occurred in the span of a one-hour conversation in which Katz was alleged to have discussed his views of claims in six separate and technically complex patents. The March 20, 2001 conversation appears to have been only an initial discussion, the goal of which was to decide whether EMC wanted to employ Katz and whether Katz wanted to work for EMC. EMC thus has not met its burden of showing that it was objectively reasonable for it to believe that a confidential relationship existed as of March 20, 2001.

■ Second, EMC must prove that, during a confidential relationship, it disclosed confidential information to Katz that is relevant to the current litigation. As noted above, the parties dispute whether any relevant confidential information

was disclosed between April 12, 2001 and July 11, 2002. Katz claims that the only information that he received from EMC during that time was contained in three boxes that he returned to EMC unopened. Although Dichiara contends that he spoke to Katz about the case several times between April 2001 and July 2002, Dichiara notably does not maintain that he discussed anything of substantive importance to the litigation in the course of these conversations, nor does he identify which of the conversations occurred on or after April 12, 2001. Katz states clearly that he initiated all of his telephone conversations with EMC's counsel during that period, that each conversation lasted no more than a few minutes, and that his purpose simply was to inquire about the status the case in light of the fact that EMC had not contacted him except to deliver the three boxes. There is no evidence that Katz was paid any fees other than for his initial four hours of work on March 20, 2001. EMC's characterizations of the discussions that took place during this period are inconsistent with the billing records. EMC has not met its burden of showing disclosure of confidential information.

Additionally, even if, for the sake of argument, the Court accepts EMC's contention that there was a confidential relationship prior to April 12, 2001, EMC has not met its burden of demonstrating that confidential information was communicated to Katz at that time. The only alleged communication during this time period occurred during the March 20, 2001 telephone conversation, which lasted for approximately one hour. Katz asserts that he discussed only his impressions of the validity of the claims of six of EMC's patents. Although, EMC represents that it offered information with respect to its litigation strategy to Katz, it has offered neither specific details of such discussion nor evidence contradicting Katz's version of the events. Just as in *Mays,* where the court concluded that "[i]n the 60 to 90 minute meeting, it is highly unlikely that there was any detailed or involved discussion concerning litigation strategies, the strengths and weaknesses of each side, the witnesses to be called, the types of experts to be retained and anticipated defenses," *Mays,* 293 F.Supp.2d at 957, EMC has not explained how it could have disclosed confidential detailed elements of its litigation strategy during such a short conversation in which several patents were discussed.[2]

Finally, to the extent that EMC means to suggest that the very disclosure of which claim terms it thought were important for validity analysis would hint at its litigation strategy, it is noteworthy that the subject matter of the discussion was material contained in publicly available patents. EMC does not develop this point with any specificity. Even assuming that a confidential relationship existed during the March 20, 2001 telephone call, EMC has not met its burden of proving that confidential information was exchanged.

Nor has EMC demonstrated sufficient prejudice to prompt the Court to interfere with HP's interest in successfully litigating this action. At this late stage, the parties have committed to selection of key terms for claim construction and infringement analysis; thus, even if EMC did reveal in the March 20, 2001 conversation which claims it found important to the litigation, no prejudice exists now, given the parties' extensive disclosures in connection with the claim construction process. In contrast, HP clearly would suffer hardship if Katz were disqualified: it relied on Katz's

---

2. The patents-in-suit are extremely technical and complex. The portion of this Court's claim construction order addressing EMC's patents exclusively is more than twenty-one pages in length.

declaration in preparing its claim construction briefs and oral argument. EMC brought the present motion on March 30, 2004, only one week before the claim construction hearing took place.

 Policy concerns also weigh in favor of denying the motion. For several reasons, disqualifying Katz under the present circumstances would not serve to promote the integrity of the legal process. First, it is unclear how striking Katz's declaration or refusing to permit HP to rely upon Katz's opinions would impact the Court's consideration of the exceedingly complex legal and factual presentation made by the parties during a two-day claim construction hearing. It is also unclear whether HP will be able to find another suitable expert witness in time for the dispositive motions and trial preparation that will follow the Court's construction of the disputed claims. Second, disqualification, on the facts of this case, would impair Katz's interest in pursuing his trade as an expert witness. It appears that EMC never intended to use Katz's services; for example, during the fifteen-month period that EMC "employed" him, it paid him only two thousand dollars for the initial patent review and telephone conversation. At the same time, according to EMC, Katz should not have been allowed to consult for other litigants. Third, without speculating as to EMC's underlying motivations, the Court notes that if an expert could be disqualified on the facts of this case, parties in other cases might be tempted to create a purported conflict solely for the purpose of preventing their adversaries from using the services of a particular expert. This concern is especially important in high-technology patent infringement cases, in which the courts, as well as the public, rely on experts to explain complicated technologies. Permitting one party to lock up all or most of the best experts might interfere with the proper interpretation of claim language—at task that potentially has preclusive effect with respect to future litigation—as well as fair evaluation of the merits of claims of infringement.

## IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that the motion is DENIED.